**HEINER, Collector of Internal Revenue, v. CROSBY.**

**SAME v. ANDERTON.**

Circuit Court of Appeals, Third Circuit.
January 24, 1928.

Nos. 3494, 3516.

1. Internal revenue ⟨⟩25—Fair market price or value of corporate stock for income tax purposes is fact question, depending on circumstances (Revenue Act 1916, § 2, subd. [c], being Comp. St. § 6336b, subd. [c]; Revenue Act 1917, § 1200, subd. [a], being Comp. St. § 6336b, subd. [a]).

Fair market price or value of corporate stock at a particular time is a question of fact, to be determined under all the circumstances, in assessing income tax on increase in value thereof, under Revenue Act 1917, § 1200, subd. (a), being Comp. St. § 6336b, subd. (a), and Revenue Act 1916, § 2, subd. (c), being Comp. St. § 6336b, subd. (c).

2. Internal revenue ⟨⟩25—"Market price" of corporate stock for income tax purposes implies market, supply and demand, sellers and buyers (Revenue Act 1916, § 2, subd. [c], being Comp. St. § 6336b, subd. [c]; Revenue Act 1917, § 1200, subd. [a], being Comp. St. § 6336b, subd. [a]).

"Market price" of corporate stock within Revenue Act 1916, § 2, subd. (c), being Comp. St. § 6336b, subd. (c), and Revenue Act 1917, § 1200, subd. (a), being Comp. St. § 6336b, subd. (a), implies existence of a market, of supply and demand, of sellers and buyers.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Market Price.]

3. Evidence ⟨⟩323(2), 601(4)—Sales are evidence of market price, but do not conclusively establish fair market price or value of corporate stock for income tax purposes (Revenue Act 1916, § 2, subd. [c], being Comp. St. § 6336b, subd. [c]; Revenue Act 1917, § 1200, subd. [a], being Comp. St. § 6336b, subd. [a]).

Sales are always evidence of market price, but do not in themselves, without regard to cir-

cumstances under which made, conclusively establish fair market price or value, required by Revenue Act 1916, § 2, subd. (c), being Comp. St. § 6336b, subd. (c), and Revenue Act 1917, § 1200 subd. (a), being Comp. St. § 6336b, subd. (a), in ascertaining taxable gain from sale of such stock.

**4. Evidence ⟐323(2)—Evidence must be heard to determine fair value of property sold under peculiar circumstances for income tax purposes (Revenue Act 1916, § 2, subd. [c], being Comp. St. § 6336b, subd. [c]; Revenue Act 1917, § 1200, subd. [a], being Comp. St. § 6336b, subd. [a]).**

Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in restricted market, may neither signify fair market price or value, nor serve as basis for determining amount of taxable gain from sale thereof, under Revenue Act 1916, § 2, subd. (c), being Comp. St. § 6336b, subd. (c), or Revenue Act 1917, § 1200, subd. (a), being Comp. St. § 6336b, subd. (a), but in such case resort must be had to evidence.

**5. Evidence ⟐323(2), 525—Good faith offers and opinions of experienced men are admissible to show fair value of stock, sold in restricted market, for income tax purposes (Revenue Act 1916, § 2, subd. [c], being Comp. St. § 6336b, subd. [c]; Revenue Act 1917, § 1200, subd. [a], being Comp. St. § 6336b, subd. [a]).**

Offers made in good faith and opinions of intelligent men experienced in business are admissible to show fair value of property, such as corporate stock, sold in such a restricted market as not to evidence fair market price or value required to ascertain taxable gain from sale thereof under Revenue Act 1916, § 2, subd. [c], being Comp. St. § 6336b, subd. (c), and Revenue Act 1917, § 1200, subd. (a), being Comp. St. § 6336b, subd. (a).

**6. Evidence ⟐113(4)—Evidence held to show sales of corporate stock in such restricted market as to justify resort to evidence of intrinsic value for income tax purposes (Revenue Act 1916, § 2, subd. [c], being Comp. St. § 6336b, subd. [c]; Revenue Act 1917, § 1200, subd. [a], being Comp. St. § 6336b, subd. [a]).**

Evidence *held* to show that sales of oil company's stock were made in such a restricted market as to justify resort to evidence of intrinsic value to ascertain taxable gain from sale thereof, under Revenue Act 1916, § 2, subd. (c), being Comp. St. § 6336b, subd. (c), and Revenue Act 1917, § 1200, subd. (a), being Comp. St. § 6336b, subd. (a).

**7. Appeal and error ⟐931(1)—District Court's judgment on its finding of fair market price or value of corporate stock for income tax purposes is presumptively correct.**

Judgment entered by District Court on its finding of fair market price or value of corporate stock from evidence of intrinsic value thereof on dates of acquisition by persons, against whom tax on gain derived from sale thereof was assessed, is presumptively correct.

**8. Evidence ⟐601(4)—Evidence held to sustain District Judge's finding that fair market value of corporate stock when acquired by persons subsequently selling it was $2 less per share than sale price (Revenue Act 1916, § 2, subd. [c], being Comp. St. § 6336b, subd. [c]; Revenue Act 1917, § 1200, subd. [a] being Comp. St. § 6336b, subd. [a]).**

Evidence *held* to sustain District Judge's finding that fair market value of Pure Oil Company's stock on July 21, 1913, and August 20, 1915, when acquired by persons selling it on July 26, 1917, for $24.50 per share, was $22.50 per share, making taxable gain of $2 per share under Revenue Act 1916, § 2, subd. (c), being Comp. St. § 6336b, subd. (c) and Revenue Act 1917, § 1200, subd. (a), being Comp. St. § 6336b, subd. (a).

In Error to the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

Action by Minnie F. Byles Crosby and by Thomas A. Anderton, executor of the last will and testament of Thomas Anderton, deceased, against D. B. Heiner, Collector of United States Internal Revenue. Judgments for plaintiffs (12 F.[2d]'604), and defendant brings error. Affirmed.

John D. Meyer, U. S. Atty., and W. J. Aiken, Asst. U. S. Atty., both of Pittsburgh, Pa. (William T. Sabine, Jr., and A. W. Gregg, both of Washington, D. C., of counsel), for plaintiff in error.

James Walton and Frank B. Ingersoll, both of Pittsburgh, Pa., for defendants in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. These cases concern the taxes paid as income on the increase in value of the stock of the Pure Oil Company under the provisions of section 1200 (a) of the Revenue Act of 1917 (40 Stat. 329 [Comp. St. § 6336b, subd. (a)], and section 2, subdivision (c) of the Revenue Act of 1916 (39 Stat. 758 [Comp. St. § 6336b, subd. (c)]). They were argued together, involve the same question of the fair market price or value of the stock, and will be disposed of in a single opinion.

On July 21, 1913, Mrs. Crosby received from the estate of her deceased husband 13,157 shares of stock. She sold them on July 26, 1917, for $24.50 per share. She placed a value of $22.50 per share on the stock at the time she received it, and so in her return for the year 1917 she reported a gain of $2 per share. The Commissioner of Internal Revenue, on the other hand, valued the stock at $14.37½ per share when acquired, and

so determined that she sold it at an increase of $10.12½ per share. He assessed the tax accordingly, and demanded payment within 10 days, on threat of penalty for nonpayment. She paid the tax and brought suit for its recovery. A jury was waived and the case tried to the court without a jury. It found that the fair market price or value of the stock at the time it was received was $22.50 per share.

In the Anderton Case, Thomas A. Anderton, executor of the estate of Thomas Anderton, deceased, acquired 10,807 shares of the common stock of the Pure Oil Company on August 20, 1915. He sold the stock on July 26, 1917, for $24.50 per share. He reported in his tax return for 1917 an increase in the value of the stock of $2 per share from August 20, 1915, to July 26, 1917. The Commissioner determined the fair market price or value of the stock when received to be $17 per share, an increase in value of $7.50 per share, and assessed the tax accordingly. This was paid under protest, and suit was brought to recover the additional tax paid on the Commissioner's determination. The learned District Judge before whom the case was tried without a jury found, as in the Crosby case, that the fair market price or value of the stock on August 20, 1915, was $22.50 per share, and so entered judgment for the plaintiff.

The collector has brought both cases here for review on writ of error. The sole question for determination, as stated above, is the fair market price or value of the stock in the Crosby case, on July 21, 1913, and, in the Anderton case, on August 20, 1915. Defendant says that the court erred in resorting to evidence of the intrinsic value of the stock, when its fair market price or value was evidenced by sales, and that the evidence in support of intrinsic value is insufficient to support the findings of fact and the judgments.

The determination of the fair market price by the Commissioner was based on the price paid for the stock on the Pittsburgh Stock Exchange on the dates in question. On July 21, 1913, the date Mrs. Crosby received her stock, 60 shares were sold on the Pittsburgh Stock Exchange at $14⅝ per share. On August 20, 1915, the date Mr. Anderton acquired his stock, 1,185 shares were sold and the price ranged from $16⅝ to $17 per share.

[1-5] The fair market price or value of stock at a particular time is a question of fact, to be determined from all the circumstances. Market price implies the existence of a market, of supply and demand, of sellers and buyers. Sales are always evidence of a market price, but the statute requires that, in "ascertaining the gain derived from the sale," there must be not simply a "market price," but a "fair market price." Sales made at a particular time and place may be significant, but the price paid is not necessarily decisive of fair market price or value. The fact of sales, in itself and without regard to the circumstances under which the sales were made, does not conclusively establish either statutory fair market price or value. Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, may neither signify a fair market price or value, nor serve as the basis on which to determine the amount of gain derived from the sale. In such cases resort must be had to evidence to determine "fair value." Offers made in good faith and opinions of intelligent men experienced in the business are admissible to show fair value. Louisville & Nashville R. R. Co. v. Western Union Telegraph Co. (C. C. A.) 249 F. 385; North American Telegraph Co. v. Northern Pacific Railway Co. (C. C. A.) 254 F. 417; Walter v. Duffy (C. C. A.) 287 F. 41; Boom Co. v. Patterson, 98 U. S. 403, 25 L. Ed. 206; United States v. Chandler-Dunbar Co., 229 U. S. 53, 77, 33 S. Ct. 667, 57 L. Ed. 1063.

[6, 7] Were the circumstances under which the stocks in question were sold peculiar, showing a restricted market, in which the sellers and buyers were limited, so that the sales did not evidence a "fair market price or value"?

The evidence shows, as the learned District Judge found, that the independent oil operators of Western Pennsylvania had for a long time suffered from monopolistic control, which interfered with and restricted every means of disposing of oil stock. The Pure Oil Company was organized in 1895, with the express purpose of protecting and maintaining what are known as "the independent interests in the petroleum industry." The organizers entered into a trust agreement whereby more than 50 per cent. of the common stock originally and subsequently issued was to be vested in a board of 15 trustees, who were to have control of the company, regardless of the legal or equitable ownership of the stock. This trust agreement could not be changed, except with the consent of three-fifths of the trustees and of the equitable owners of three-fifths of the shares held in trust.

On March 1, 1913, the Pure Oil Company

had 907,049 shares of stock, outstanding. For the six months period from February 1, 1913, to July 31, 1913, the percentage of the average monthly sales on the Pittsburgh Stock Exchange to the total shares outstanding was 1.17 per cent. A large majority of the stockholders held their stock from the beginning until the final sale on June 26, 1917. On March 1, 1913, because of the existence of the trust agreement, it was not possible to purchase a controlling interest in the company on the Pittsburgh Stock Exchange, where only a limited number of shares at any time were offered, or anywhere else. This fact alone, during the existence of the agreement, made the selling price on the Pittsburgh Stock Exchange of little weight as a gauge of fair value.

The company extended its property throughout a number of other states, and established oil-distributing stations throughout this country and in Europe. By March 1, 1913, they had organized and controlled the following seven subsidiary companies: Pure Oil Operating & Producing Company, Northwestern Oil & Gas Company, United States Pipe Line Company, Quaker Oil & Gas Company, Producers' & Refiners' Company, Pure Oil Pipe Line Company, and the Pure Oil Steamship Company. These various properties, by reason of their geographical position, had great strategic value. The parent company, with its subsidiaries, had every facility for handling oil from its crude state to consumption.

In 1911 the company sold its European stations in Hamburg and Rotterdam, obtaining with the sale a contract for the term of 10 years, by which the company could obtain from the South Penn Oil Company, at the common market price, 2,000 barrels daily of Pennsylvania crude oil, or a like amount of Illinois crude oil, if that grade was desired. This, with the crude oil gathered from its own connections, gave the company a daily production of about 8,000 barrels of crude oil. The company itself was refining crude oil, and in addition was delivering crude oil to seven or eight other refineries. This contract was of very great value, as the company could take the oil when it could make a profit on refining, or refuse to take it when it could not do so. The value of this contract, together with the good will of the company, the value arising from its geographic and strategic positions and other intangibles, were in no manner reflected on the books. The book values, upon which considerable stress was laid, represent the cost of the properties of the corporation, less depreciation and depletion.

It was clearly established that on July 16, 1914, parties of unquestioned financial ability made an offer of $22.50 per share for the controlling interest in the stock. The parties met in a banker's office in New York on July 29th for the purpose of closing the deal, and were on the point of passing $100,000 earnest money, when word of the breaking out of the World War and the closing of the New York Stock Exchange came over the telephone. This immediately terminated the negotiations. On that date the quotation on the Pittsburgh Stock Exchange was 18⅝.

It was established that some time between the fall of 1913 and the spring of 1914, at a meeting of the stockholders representing a controlling interest, called for the purpose of determining at what price the majority of the stockholders were willing to sell, each shareholder separately placed on a piece of paper the price he was willing to pay, and the average price thus ascertained was a little in excess of $26 per share. Afterwards, on June 26, 1917, the large shareholders, constituting the controlling interest, sold their stock for $24 per share.

Judge Buffington speaking for this court in the case of Walter v. Duffy, supra, summed up a somewhat similar situation as follows: "Now, in the case before us, we have a situation where we think the existence of a fair determinative, evidential market for this particular stock did not exist. That the stock of the company was not traded in generally is clear. The mutualization in progress, the limited holdings of the stock, its acquisition from time to time by those who bought with a view to holding and awaiting the action of the mutualization, commercially were all factors of unusual character, and made the valuation different from a market created by buyers willing to buy and sellers willing to sell, and where offers to sell challenged the attention of buyers, and offers to buy challenged the attention of sellers."

The facts of the case at bar bring it within the principle we there announced, and justified the court below in resorting to evidence of intrinsic value in order to determine the "fair market price or value" on the dates the plaintiffs acquired their stock. The judgment entered on this finding is presumptively correct.

[8] There was, in addition, a number of witnesses of reputation for good character, long experience in the oil business, and intimate knowledge of the property and assets of the

Pure Oil Company, who testified that the fair value of the stock on March 1, 1913, was $22.50 per share, and that there was thereafter no substantial change for the worse.

After giving due consideration to the sale and prices bid on the Pittsburgh Stock Exchange, restricted as they were, and taking into consideration the company's property, good will, and strategic position, together with the evidence of those most familiar with the property and most competent to estimate its value, the learned District Judge found as a fact that the fair market value of the plaintiff's stock on the dates in question was $22.50 per share, making the taxable gain by reason of the sale $2 per share.

The defendant has not convinced us that the judgment is erroneous, and it is affirmed.