GILLETTE RUBBER COMPANY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 43052, 50073.   Promulgated October 31, 1934.

*Lee I. Park, Esq.*, for the petitioner.
*J. A. Lyons, Esq.*, for the respondent.

484

OPINION.

GOODRICH: The parties agree, and upon examination we accept their conclusion, that petitioner's acquisition of the assets of the old company and the distribution of its securities did not constitute a statutory reorganization. Consequently, the cost basis of the assets in the hands of the old company does not carry over and it becomes necessary to determine the basis of the assets in the hands of petitioner. It is clear that the fair market value of the securities issued in payment for the assets is the cost basis for the assets in petitioner's hands.[1] Likewise, it appears that if the fair market value of the securities so issued cannot be determined from the record of sales thereof, or other evidence pertaining to the securities, then the value to be assigned to them, and to be taken as the cost basis of the assets in petitioner's hands, is the fair market value of the assets for which they were exchanged.[2]

Respondent, in computing the deficiencies here in controversy, determined the fair market value of the securities issued by petitioner to be $1,269,805.43; took that amount as the cost basis of the assets acquired and allocated it amongst them. Upon brief he revises his determination, arriving at a basis of $1,487,564.36, which he obtains by valuing the bonds at 75 percent of par, the preferred stock at 50 percent of par, and adding the cash paid to the preferred credi-

---

[1] Sec. 204 (a), (c), Revenue Act, 1926; sec. 111 (a), sec. 113,, sec. 114, sec. 23, Revenue Act, 1928, as to basis for determining gain or loss and allowances for depreciation.

[2] For statements and discussion of this rule see: *William Ziegler, Jr.*, 1 B. T. A. 186; *Wallis Tractor Co.*, 3 B. T. A. 981; *George A. Ricker*, 10 B. T. A. 11; *John Glackner Realty Corporation*, 11 B. T. A. 151; *Kanawha City Co.*, 13 B. T. A. 912; *Jefferson Livingston*, 18 B. T. A. 1184; *Reliance Investment Co.*, 22 B. T. A. 1287; *Biscayne Bay Islands Co.*, 23 B. T. A. 731; *Stollwerck Chocolate Co.*, 4 B. T. A. 467.

tors and the liabilities of the old company assumed by petitioner. From this computation of value he excludes petitioner's common stock, for reasons to which we will later refer.

But we agree with petitioner in its contention that the fair market value of these securities at the basic date cannot be determined by the evidence pertaining strictly to the securities; that there was no market for them; that there were no transactions in them which would reflect their fair market value, as that phrase has been so often judicially defined. True enough, as respondent points out, and as we have found as a fact, there were sales of considerable amounts of these securities, but all these transactions were consummated under peculiar conditions and limitations. The securities were not freely bought and sold; the sales were made to a restricted class of purchasers, and under peculiar compulsion. Efforts to arrange a public offering were unavailing.

The common stock, for instance (or rather a part of it—the balance having been issued and deposited to secure company management), was sold to the former stockholders of the old company under an agreement entered into more than a year before the stock was issued, at a price known to be a low one, purposely made so to secure the good will of those stockholders and give them a chance to recoup. None of it was publicly offered; only six outsiders were permitted to buy it, and they for particular reasons and in small amounts. The preferred stock and bonds were not sold to the public, but were issued pro rata to the creditors of the old company. Hermann, the underwriter, and controller of the new company, offered to buy in the preferred stock within a specified time at one-half its face value. The creditors faced a dilemma—whether to turn in their stock and thus save a part of their claims, or hold it in hope of one day making a larger collection. Whether they were advised of the facts pointing to prosperity for the new company does not appear; it seems doubtful. No purchaser could be found except Hermann and, later, the company. So with the bonds; there was no place to sell them except to the company itself, and its·officers, who proceeded to pick up offerings at their own prices.

Sales made under such conditions do not establish a fair market value,[3] nor can later sales, made at increased prices because, as time passed, it was realized the company's operations were to be successful, relate back to the basic date to do so. And the fact that well known underwriting firms refused to put these issues on the public

[3] In addition to decision cited in footnote 2 above, see: *Premier Packing Co.*, 12 B. T. A. 637, and Cases there cited; *Helvering* v. *Kendrick Coal & Dock Co.*, 72 Fed. (2d) 330; *Essex Motors*, 22 B. T. A. 804; *Walter* v. *Duffy*, 287 Fed. 41; *Phillips* v. *United States*, 24 Fed. (2d) 195; *Heiner* v. *Crosby*, 24 Fed. (2) 191.

market is another consideration leading to our conclusion that, viewing only the securities issued by petitioner on August 1, 1925, we cannot determine their fair market value at that time.

It becomes necessary, then, to determine the fair market value of the assets exchanged for the securities which is to be taken as the equivalent of the value of the securities and as the cost basis for the assets in petitioner's hands. As to that, the evidence satisfies us that the fair market values of the fixed assets, of the inventories, and of the contracts (which are the only ones upon the valuation of which the parties differ) were the amounts at which these were set up on petitioner's books. Therefore, we have found as a fact that, at August 1, 1925, these assets were of the values set out in the schedule contained in our findings. They should be used as the equivalent of the fair market value of the securities for which exchanged, and as the cost basis for determining depreciation and gain or loss upon subsequent sale.

In determining the deficiencies here in controversy, respondent considered that petitioner issued all its securities in payment for the assets taken over from the old company. He now says he erred in so doing; that all the common stock and $50,000 par value of the preferred were *sold* to Hermann for cash and should be eliminated from the consideration given by petitioner in exchange. Some months after trial of the case, having meantime requested and been granted additional time within which to file his brief, respondent moved to file amended answers to the petitions (which he said conformed his pleadings to the proof) affirmatively pleading this error and making claim to increased deficiencies. Petitioner opposed the filing of the amended answers, chiefly upon the grounds that the proof did not bear out respondent's affirmative allegations, and because the motion to file this further pleading was not timely, and that to grant it would be an abuse of discretion, since the case had been tried upon the issues as originally framed and the hearing had been concluded.

Whether respondent's motion was timely, we need not decide. We deny it, and refuse the amended answer, for the reason that the allegations thereof are not supported by the proof of record.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

MURDOCK, dissenting: Stock and bonds of the purchaser formed the consideration paid for the assets. No assets were acquired by the issuance of the common stock, instead it was issued to Hermann for other purposes. The total par value of the bonds and preferred stock issued for assets amounted to $1,459,610.87. The assets cer-

tainly did not cost the petitioner approximately $2,000,000 more than the par value of these securities. If one were to assume that the common stock was issued for assets, still a value of about $20 per share would have to be attributed to it in order to absorb the difference between the par value of the bonds and preferred stock and the cost of the assets as determined in the prevailing opinion. The cost of the assets as determined by the Commissioner should be approved.

