109 T.C. No. 16


UNITED STATES TAX COURT


CHARLES H. BROWNING, JR., AND PATRICIA L. BROWNING, Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 16336-94, 20287-95.     Filed November 25, 1997.


H county has a program to preserve farmland by purchasing development rights from landowners. Under that program, Ps conveyed an easement to the county in consideration of a cash downpayment and an installment note. Ps claimed a charitable contribution on the basis that they had made a "bargain sale" of the easement to the county. The consideration received by Ps from the county was consistent with consideration paid by the county to other participating landowners under the program. Relying on sec. 1.170A-14(h)(3)(i), Income Tax Regs., R argues that evidence of consideration paid by the county under the program is determinative of the fair market value of the easement.
Held: Because Ps have shown that the market created by the county under the program was populated by sellers intending to make gifts to the county and was not determinative of fair market value, Ps are entitled to present evidence of the fair market value of their land before and after the conveyance of the

easement.  Held, further, fair market value of easement
determined.  Held, further, economic benefit of
charitable contribution deduction, tax-free interest,
and tax deferral from installment sale are not part of
amount realized by petitioners; amount realized and
charitable contribution determined.

James L. Thompson, Lewis R. Schumann, and Glenn M. Anderson,
for petitioners.

Susan T. Mosley and Warren P. Simonsen, for respondent.

HALPERN, Judge:  These consolidated cases involve the
following determinations by respondent of deficiencies in
petitioners' Federal income taxes:

| Year | Deficiency |
|------|-----------|
| 1990 | $16,910 |
| 1991 | 3,481 |
| 1992 | 7,720 |
| 1993 | 4,013 |

The issue in dispute is the amount (if any) of petitioners'

charitable contribution on account of petitioners' conveyance to

Howard County, Maryland, in 1990 of an easement relating to

certain real property.

Unless otherwise noted, all section references are to the

Internal Revenue Code in effect for the years in issue, and all

Rule references are to the Tax Court Rules of Practice and

Procedure.

FINDINGS OF FACT

Introduction

Some facts have been stipulated and are so found.  The stipulation of facts filed by the parties, along with accompanying exhibits, is incorporated herein by this reference.

Petitioners resided in Woodbine, Maryland, at the time the petitions herein were filed.

Subject Property

The real property that is the subject of this case is a 52.44 acre tract of land located at 1874 Florence Road, Woodbine, Howard County, Maryland (the land and Howard County or the county, respectively).  The land has been in Mrs. Browning's family for six generations and was acquired by petitioners in 1987 following the death of Mrs. Browning's parents.  The principal use of the land is agricultural.  The land is situated between tracts of land owned by William Barnes, to the north (the Barnes tract), and by Gene Mullinix, to the south (the Mullinix tract).

Conveyance

By deed of easement dated December 14, 1990 (the conveyance date), petitioners conveyed to Howard County an easement restricting development of the land (the easement).  In consideration thereof, petitioners received $30,000 in cash

immediately and Howard County's agreement to make installment payments of an additional $279,000 over a period of approximately 30 years (for a total sales price of $309,000). The bulk of the sales price ($235,000) is to be paid at the end of the 30-year installment period. Interest on the unpaid balance of the sales price is payable at a minimum rate of 8 percent a year.

Land Preservation Program

Howard County acquired the easement pursuant to the county's Agricultural Land Preservation Program (the Program). The Program is the county's primary tool for preserving farmland. Pursuant to the Program, the county purchases development rights from landowners and holds those rights in perpetuity. The only permissible use of land in the Program is agricultural use. A landowner's participation in the Program is voluntary. The objective of the Program is to support the agricultural community by helping to keep the county's land base available for farming and by minimizing the impact of residential development in agricultural areas.

Prior to 1989, Howard County was limited in that, by law, the most it could pay for development rights was 50 percent of the fair market value of the subject land. In 1989, Howard

County invigorated the Program by removing the purchase price limitation and by adopting a new financing mechanism involving installment purchase agreements. The installment purchase agreements were to have a term of approximately 30 years, which the county believed allowed it to leverage its accumulated funds over an extended period. The county's obligation to make installment payments was described by the county as a general obligation of the county. The county advised interested landowners that potential benefits of a sale to the county included tax-exempt interest on the installment obligation, the deferral of taxes on capital gains, and a charitable contribution deduction.

Although, after 1988, Howard County was not limited by law in what it could pay for development rights, the county initially adopted a policy of paying no more than $6,500 an acre (later increased to $6,600) (the limitation). The maximum price was paid for the best qualified farmland as determined by a formula adopted by the county, and lesser amounts were paid for lesser qualified farmland. The limitation was adopted as a budgetary constraint because the county had limited funds to purchase development rights to the 20,000 to 30,000 acres it wished to encumber. Given Howard County's knowledge of the value of farmland in the county, the limitation was fixed so as to produce

a price equal to only a portion (50 to 80 percent) of the maximum expected fair market value of development rights.  In the case of each acquisition of development rights pursuant to the Program, before an offer was made by Howard County, the county obtained an appraisal of the value of the subject property both encumbered and unencumbered by the development restriction.  The price offered by the county was always less than the reduction in fair market value indicated by the appraisal.

Market for Development Rights

During 1990, the only purchaser of development rights to farmland in Howard County was the county, under the Program.

Petitioners' Charitable Contribution Deductions

With respect to petitioners' participation in the Program, Howard County obtained an appraisal by Edward A. Griffith of the E.A. Griffith Real Estate Co., Towson, Maryland.  Mr. Griffith is an experienced real estate appraiser.  Mr. Griffith conducted his appraisal as of April 10, 1990, and concluded that the fair market value of the land was $771,600, the agricultural value of the land was $173,052, and the value of the easement was $598,500.

Mr. Griffith updated his appraisal of the land for petitioners on February 27, 1991, and concluded that the fair market value of the land as of December 1, 1990, remained $771,600.  In accordance with Mr. Griffith's appraisal of the easement at $598,500, petitioners claimed a charitable contribution of $289,500 during 1990, which is the difference between the appraised value of $598,500 and the $309,000 received for the easement from Howard County.  Because of annual limitations on the amount of the deduction that may be claimed by an individual on account of charitable contributions, petitioners claimed deductions on account of the conveyance of the easement to the county as follows:

| | |
|---|---|
| 1990 | $52,194 |
| 1991 | 23,813 |
| 1992 | 51,645 |
| 1993 | 44,895 |
| Total | $172,547 |

Respondent disallowed those deductions on the grounds that petitioners had failed to substantiate the charitable contribution resulting from the conveyance of the easement.

Expert Testimony

Petitioners' Experts

Stanley O. Benning

Petitioners presented the expert testimony of Stanley O. Benning, president of Benning & Associates, Inc., land planning consultants. Mr. Benning is registered as a landscape architect in Maryland and other States and is an experienced land planner. Mr. Benning has opinions as to the number of 3-acre estate lots that could be developed on the land under three alternative scenarios: (1) development of the land in conjunction with both the Barnes and Mullinix tracts, (2) development of the land in conjunction with only the Barnes tract, and (3) development of the land alone. Mr. Benning is of the opinion that, under the first two scenarios, 16 lots could be developed on the land and, under the third scenario, 15 lots could be developed on the land. Mr. Benning's opinions are expressed in a report dated September 16, 1996 (the Benning report).

### Gary Lee Sapperstein

Petitioners presented the expert testimony of Gary Lee Sapperstein of Sapperstein & Associates, real estate appraisers. Mr. Sapperstein is a certified general real estate appraiser in Maryland and other States. Mr. Sapperstein has opinions as to the fair market value of the easement as of the conveyance date. Mr. Sapperstein believes that, as of the conveyance date, the highest and best use of the land was for development into single family residential lots. Mr. Sapperstein has reviewed the

Benning report and, apparently, accepts its conclusions as to lot yield:

> The * * * [Benning report] illustrates that the subject property's size, shape and topography is capable of being developed with 15 single family residential lots. It should be noted that there is a potential for an increase in the yield to 16 lots if the property were to be jointly developed with the adjacent property owners.

Mr. Sapperstein believes that the highest and best use of the land after conveyance of the easement is as a farm (subject to the restrictions of the easement).

Mr. Sapperstein was aware of previous conveyances of development rights to Howard County under the Program, but he concluded that there did "not exist a substantial record of 'fair market value' transfers that present a meaningful or valid comparison to the subject property."  As a disadvantage, he mentions the initial limit of 50 percent of fair market value of the subject land and the subsequent per acre cap of $6,600. Mr. Sapperstein chose to estimate the value of the easement by using the "Before and After" approach, comparing market data for comparable properties sold with development rights intact to market data for properties sold for agricultural use. Mr. Sapperstein concludes that the value of the development rights that were sold to Howard County is the difference between the "before" and "after" values.

Based on his assumptions as to highest and best use and lot yield, Mr. Sapperstein reached the conclusion that (1) if 15 lots could be developed on the land, the fair market value of the easement on the conveyance date was $518,000, and (2) if 16 lots could be developed on the land, the fair market value of the easement on the conveyance date was $563,000.  Mr. Sapperstein provides the following tables to illustrate his calculations (the entries for improvements reflect a dwelling on the land):

### 15 Lot Scenario

| Valuation | Land | Improvements | Total |
|---|---|---|---|
| Before | $675,000 | $375,500 | $1,050,500 |
| After | 157,000 | 375,500 | 532,500 |
| Easement Value (15 lots) | | | $518,000 |

### 16 Lot Scenario

| Valuation | Land | Improvements | Total |
|---|---|---|---|
| Before | $720,000 | $375,500 | $1,095,500 |
| After | 157,000 | 375,500 | 532,500 |
| Easement Value (16 lots) | | | $563,000 |

Respondent's Expert

M. Ronald Lipman

Respondent presented the expert testimony of M. Ronald Lipman of Lipman Frizzell & Mitchell, LLC, real estate appraisers and consultants.  Mr. Lipman is a certified general real estate appraiser in Maryland and other States.  Mr. Lipman has an

opinion as to the fair market value of the easement as of December 1, 1990.  Mr. Lipman believes that, as of that date, the highest and best use of the land was for development into single family residential lots.  As was true for Mr. Sapperstein, Mr. Lipman believes that the highest and best use of the land after conveyance of the easement is as a farm (subject to the restrictions of the easement).

Montgomery County is adjacent to Howard County.  Mr. Lipman was aware that, in Montgomery County, sales of development rights, known as "Transferable Development Rights" (TDRs), occur with some frequency.  Mr. Lipman testified that a Montgomery County landowner who conveys a TDR gives up the right to residential development and is left with land available only for agricultural or similar use.  He believes that sales of TDRs in Montgomery County are at prices that represent "a true indication of arms length negotiations for the totality of the development rights".  Mr. Lipman believes that Montgomery County sales of TDRs present "dependable comparable sale[s] in the context of development rights valuation and can be used as direct sales comparisons."  Mr. Lipman notes that Howard County's instructions to their appraisers state:  "By law, Howard County may not pay more for the easement than fifty (50) percent of the appraised fair market value of the property."  (Fn. ref. omitted.)

Mr. Lipman recognizes that Howard County landowners may accept a price from the county below the before and after differential in value of their land.  He concludes:

> Accordingly, while the Montgomery County sales of TDR's adequately represent the totality of monetary award and therefore are dependable vis-a-vis the direct comparison approach, development rights sales in Howard County do not reflect those characteristics. Therefore, the Howard County sales themselves do not constitute full consideration and we cannot use them from a direct comparison perspective.  * * *

Mr. Lipman considers data from Montgomery County sales of TDRs that "would suggest development rights values for property in Howard County by direct comparison in the range of $6,000 to $6,500".  Nevertheless, he concludes:  "After considering this data, we believe that the before and after approach to value is a more accurate measure of the subject's development rights." During his oral testimony, Mr. Lipman agreed that data from Montgomery County sales of TDRs is irrelevant to determining the fair market value of the easement.

Based on his assumptions as to highest and best use, Mr. Lipman reached the conclusion that the fair market value of the easement on December 1, 1990, was $367,000.  Mr. Lipman provided the following table to illustrate his calculations (the entries for improvements reflect a dwelling on the land):

|  | Land | Impvts. | Total |
|---|---|---|---|
| Before Value | $524,000 | $387,300 | $912,000 |
| Less: After Value | 157,000 | 387,300 | 545,000 |
| Easement Value (rounded): | $367,000 | N/A | $367,000 |

OPINION

I.  Introduction

Petitioners assert that they made a bargain sale of the easement to Howard County and that they are entitled to claim a charitable contribution equal to the difference between the fair market value of the easement and the amount realized from the sale.  Respondent contends that petitioners have failed to demonstrate that the fair market value of the easement exceeded the amount realized from the sale.  There is no dispute regarding petitioners' satisfaction of any other requirements set forth in section 170 and the regulations thereunder, including whether the contributed property (if any) constitutes a "qualified conservation contribution" under section 170(h)(1).  Therefore, the only issues we must address are the fair market value of the easement and the amount realized from the sale.

II.  Principal Provisions of Law

Section 170(a)(1) provides the following general rule with respect to charitable contributions:

There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year.  A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

Section 1.170A-1(c)(1), Income Tax Regs., provides in pertinent part:  "If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution".  Fair market value, as defined by the regulations, "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  Sec. 1.170A-1(c)(2), Income Tax Regs.

Section 1.170A-7(c), Income Tax Regs., provides that, except as provided in section 1.170A-14, Income Tax Regs., the amount of the deduction under section 170 in the case of a partial interest in property is the fair market value of the partial interest at the time of the contribution.

Section 1.170A-14(h)(3)(i), Income Tax Regs., in part, provides as follows:

The value of the contribution under section 170 in the case of a charitable contribution of a perpetual conservation restriction is the fair market value of the perpetual conservation restriction at the time of the contribution.  See §1.170A-7(c).  If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a

governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * *

III. Arguments of the Parties

Petitioners, relying principally on the testimony of their experts, contend that the fair market value of the easement on the conveyance date was $563,000.[1] Petitioners argue that the amount realized on the sale of the easement is $309,000, and, therefore, the amount of the charitable contribution is $254,000.

Respondent argues that petitioners' conveyance of the easement to Howard County did not constitute a bargain sale because the amount paid by Howard County to petitioners was in

---

[1] Petitioners recognize that $563,000 is less than the $598,500 (1) determined by Mr. Griffith in his appraisal as the fair market value of the easement and (2) used by petitioners in determining their claim of a $289,500 charitable contribution on account of their sale of the easement to Howard County. Petitioners ask that their return be "corrected to read * * * $254,000" for the fair market value of the contributed portion of the easement to Howard County. Because of the annual limitation on the amount of the deduction that may be claimed by an individual on account of charitable contributions, see sec. 170(b), petitioners' requested correction does not affect the deficiencies determined by respondent for the years in question. We need deal no further with the consequence of petitioners' request for a correction of their return.

line with the amount that the county paid generally for development rights under the Program and, thus, represented the fair market value of the easement. Respondent relies on section 1.170A-14(h)(3)(i), Income Tax Regs., which prescribes a methodology for determining the fair market value of donated easements of the type conveyed by petitioners to the county. Respondent argues that there is a universe of sales of development rights to the county under the Program, that that universe constitutes a substantial record of sales of comparable development rights, and that there were no other sales of development rights in the county during 1990. Relying on section 1.170A-14(h)(3)(i), Income Tax Regs., respondent denies the relevance of any appraisal evidence that would support any different (greater) fair market value. Thus, by, in effect, defining the fair market value of the property transferred by what the county paid for it, respondent denies that petitioners made a bargain sale to the county; denying that they made a bargain sale, respondent denies that they made a charitable contribution.

Alternatively, respondent argues that the fair market value of the easement is no greater than $367,000 and that the "valuable benefits" received by petitioners, including the $309,000 and the anticipated charitable contribution deductions,

must be subtracted from that figure to determine properly the amount of the charitable contribution.[2]

## IV. Analysis of the Fair Market Value of the Easement

### A. Introduction

A bargain sale is a transfer of property that is in part a sale or exchange and in part a gift. See section 1.1001-1(e)(2) Example (3), Income Tax Regs., which provides as follows:

> A transfers property to his son for $30,000. Such property in A's hands has an adjusted basis of $30,000 (and a fair market value of $60,000). A has no gain and has made a gift of $30,000, the excess of $60,000, the fair market value, over the amount realized, $30,000.

Where the bargain sale is to a charitable organization, the gift generally constitutes a charitable contribution. See sec.

---

[2] It should be noted that, in making the alternative argument, respondent does not rely on the following sentences of sec. 1.170A-14(h)(3)(i), Income Tax Regs.:

> If, as a result of the donation of a perpetual conservation restriction, the donor or a related person receives, or can reasonably expect to receive, financial or economic benefits that are greater than those that will inure to the general public from the transfer, no deduction is allowable under this section. However, if the donor or a related person receives, or can reasonably expect to receive, a financial or economic benefit that is substantial, but it is clearly shown that the benefit is less than the amount of the transfer, then a deduction under this section is allowable for the excess of the amount transferred over the amount of the financial or economic benefit received or reasonably expected to be received by the donor or the related person. * * *

1.170A-4(c)(2)(ii), Income Tax Regs. "In order for a conveyance to constitute a charitable contribution as a bargain sale the seller must make the conveyance with the requisite charitable intent and the fair market value of the property on the date of the sale must in fact exceed the sales price." Grinslade v. Commissioner, 59 T.C. 566, 577 (1973); accord Waller v. Commissioner, 39 T.C. 665, 677 (1963); see also Stark v. Commissioner, 86 T.C. 243, 255-256 (1986) (taxpayer who makes a bargain sale to charity is entitled to claim a charitable contribution equal to the difference between the fair market value of the property and the amount realized from the sale). It is clear from respondent's briefs that respondent is not challenging petitioners' charitable intent ("respondent would concede that petitioners' evidence as to the subjective beliefs of the parties is persuasive on the issue of donative intent"), but is arguing that the fair market value of the easement did not exceed the amount realized from its sale: "[P]etitioners bear the burden of showing that what they received in exchange for the deed of easement was not commensurate with the value of the property exchanged." Therefore, we shall first determine the fair market value of the easement on the conveyance date.

B. Section 1.170A-14(h)(3)(i), Income Tax Regs.

The general rule is that the amount of a charitable contribution made in property is the fair market value of the

property at the time of the contribution.  Sec. 1.170A-1(c)(1),

Income Tax Regs.[3]  That is no less the general rule if the

charitable contribution is of a partial interest in property,

sec. 1.170A-7(c), Income Tax Regs., including a perpetual

conservation restriction such as the easement.  Sec. 1.170A-

14(h)(3), Income Tax Regs.  The preferred way of determining fair

market value is by applying the marketplace standard found in the

regulations to the property contributed.  See sec. 1.170A-

1(c)(2), Income Tax Regs. ("fair market value is the price at

which the property would change hands between a willing buyer and

a willing seller, neither being under any compulsion to buy or

sell and both having reasonable knowledge of relevant facts").

In the absence of a well-established market for property of the

type contributed, however, the marketplace standard of the

regulations may be difficult to apply.  See, e.g., Symington v.

Commissioner, 87 T.C. 892, 895 (1986) ("Unfortunately, since most

open-space easements are granted by deed of gift there is rarely

---

[3]    In this case, the contributed property (if any) is the
difference between the fair market value of the easement and the
amount realized from the sale.  See supra sec. IV.A.  A
determination of the fair market value of the contributed
property (if any), independent of an examination of the fair
market value of the easement and the amount realized from the
sale would be difficult at best.  Therefore, we shall determine
the fair market value of the easement and derive the fair market
value of the contributed property (if any) therefrom.

an established market from which to derive the fair market value.").

In the case of a perpetual conservation restriction, if the market for such restrictions is not well established, it is usually necessary to value the restriction by applying a "before and after" analysis; i.e., a comparison of the fair market value of the donor's property unencumbered by the restriction with the fair market value of the property after the conveyance of the restriction, with any diminution of value to be ascribed to the fair market value of the restriction. See, e.g., Symington v. Commissioner, supra at 895 & n.5, which states as follows:

> This method has been approved by the Internal Revenue Service, see Rev. Rul. 73-339, 1973-2 C.B. 68, as clarified by Rev. Rul. 76-376, 1976-2 C.B. 53, and endorsed by Congress in connection with the adoption of the Tax Treatment Extension Act of 1980, see S. Rept. 96-1007 (1980), 1980-2 C.B. 599, 606.

Nothing in section 1.170A-14(h)(3)(i), Income Tax Regs. (the PCR valuation regulation), contradicts that analysis; indeed, the PCR valuation regulation adopts the serial approach described: "If no substantial record of market-place sales is available to use as a meaningful or valid comparison", the general rule is a before and after approach.

Respondent, however, argues that the second substantive sentence of the PCR valuation regulation, see supra sec. II., which sets forth the marketplace sales analysis, is the beginning

and end of the inquiry into the fair market value of the easement, notwithstanding evidence to support a finding that sales of development rights in Howard County occur in an inhibited market. Respondent, thus, seeks to preclude petitioners from using appraisal evidence to establish a greater value. We believe that respondent's interpretation of the regulation is misguided.

The first substantive sentence of the PCR valuation regulation, see supra sec. II., establishes the general rule that the value of the contribution under section 170 of a perpetual conservation restriction is the fair market value of the restriction at the time of contribution. When there is evidence to support a finding that marketplace sales of such restrictions are unreliable, blind application of the second substantive sentence, which provides a method for determining the amount required by the rule of the first substantive sentence, would ignore the purpose of the regulation.[4] Essentially, respondent's

_____

[4] Respondent's interpretation of the PCR valuation regulation would produce indefensible results in the context of an easement market consisting only of bargain sales (such as a governmental program with a price limitation). For example, assume that petitioners' assertions are correct and that Howard County pays no more than 50 to 80 percent of the fair market value of easements pursuant to the Program. Respondent's interpretation of the regulation would lead to the conclusion that the first participant in the Program, assuming the absence of any other similar governmental programs and of evidentiary problems, may employ before and after valuation to establish the fair market

(continued...)

interpretation of the PCR valuation regulation narrowly focuses on whether there exists a substantial record of sales of comparable easements, irrespective of whether a comparison of the sale of the subject easement to such sales of comparable easements would yield the proper amount of the deduction under section 170.  That misguided approach fails to recognize that a substantial record of sales of comparable easements must provide a "meaningful or valid comparison" to be considered a record of comparable sales.  Sec. 1.170A-14(h)(3)(i), Income Tax Regs. (third substantive sentence).

The meaningful or valid comparison standard serves the purpose of determining the proper amount of the deduction under section 170 by establishing the _fair_ market value of the contributed property rights and does not serve the function of determining _some_ market value of the subject easement as an independent objective.  Indeed, other portions of the PCR valuation regulation support that assertion.  In the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family, the amount of the deduction under section

---

[4](...continued)
value of the easement conveyed because of the nonexistence of comparable sales records, but the 100th participant would be limited to establishing a value for the easement conveyed that is no more than 50 to 80 percent of its fair market value.

170 is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. (fourth substantive sentence). Sales of easements comparable to the donated easement covering a portion of the contiguous property owned by the donor and the donor's family and, thus, the market value of such easements are irrelevant.

In conclusion, we must examine the applicability of the second substantive sentence of the PCR valuation regulation in light of its role in determining the proper amount of the deduction under section 170. Therefore, we are not required to accept the substantial record of sales of development rights to Howard County under the Program as determinative of the fair market value of the easement when there is evidence to support a finding that those sales occur in an inhibited market.

D. Uninhibited Markets

Notwithstanding the establishment of a market to which reference may be had for sales data, such data may not yield a demonstration of the fair market value of a particular property (or an interest in property) if general conditions or those affecting particularly the sales that have actually transpired do not "fairly" reflect the circumstances surrounding the specific property to be valued. Estate of Wright v. Commissioner, 43 B.T.A. 551, 555 (1941). That general proposition limiting the

use of market data was established early in the development of the tax law by the Court of Appeals for the Third Circuit in Heiner v. Crosby, 24 F.2d 191, 193 (3d Cir. 1928), with respect to shares of stock:

> The fair market price or value of stock at a particular time is a question of fact, to be determined from all the circumstances.  Market price implies the existence of a market, of supply and demand, of sellers and buyers.  Sales are always evidence of a market price, but the statute requires that, in "ascertaining the gain derived from the sale," there must be not simply a "market price," but a "fair market price." Sales made at a particular time and place may be significant, but the price paid is not necessarily decisive of fair market price or value.  The fact of sales, in itself and without regard to the circumstances under which the sales were made, does not conclusively establish either statutory fair market price or value.  Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, may neither signify a fair market price or value, nor serve as the basis on which to determine the amount of gain derived from the sale.  In such cases resort must be had to evidence to determine "fair value."  Offers made in good faith and opinions of intelligent men experienced in the business are admissible to show fair value.
> * * *

Accord, e.g., Berry Petroleum Co. & Subs. v. Commissioner, 104 T.C. 584, 637-638 (1995) (generally, best evidence of value is actual sales:  "However, prices obtained at forced sales, at public auctions, or in restricted markets may not be the best criteria of value, particularly when other evidence shows that the property would sell at a higher price under different circumstances.").

We have found sales data not to be indicative of fair market value where property was sold to the highest bidder at an "unrestricted auction", with no minimum bid or number of bids required, and there was evidence that the property had an intrinsic value far in excess of the auction sales price and could have been sold under other circumstances at a considerably higher price. McGuire v. Commissioner, 44 T.C. 801, 809 (1965); see also Stollwerck Chocolate Co. v. Commissioner, 4 B.T.A. 467, 471 (1926) ("Nor is the evidence of the price at which some of the stock of the taxpayer was sold to the public sufficient in our minds to establish the value either of the stock or assets acquired, in the absence of some showing as to the manner and volume in which sales were made."). In Gillette Rubber Co. v. Commissioner, 31 B.T.A. 483, 491 (1934), we rejected as determinative of the fair market value of certain common stock "a price known to be a low one, purposely made so to secure the good will of * * * [former] stockholders and give them a chance to recoup [their prior losses]."

On brief, respondent recites:

> Petitioners contend that the cash paid by Howard County for the development rights to their property does not represent the fair market value of the development rights. This argument is largely based on two factors: 1. petitioners did not believe the cash payments represented the fair market value of the property conveyed; and 2. Howard County did not intend to pay them fair market value for their easement.

In response, respondent concedes that petitioners' evidence as to the subjective beliefs of the parties (petitioners and Howard County) is persuasive on the issue of donative intent. See supra sec. IV.A. We take that response as a concession by respondent that petitioners and the county intended a bargain sale; i.e., a part sale part gift. Certainly, that conclusion is supported by the testimony of petitioner Charles Browning (the $6,000 an acre received for the easement "couldn't possibly represent the fair market value of the easement") and Donna Mennitto, administrator of the Program ("It was never the intention of the County to pay the full easement value and we do not believe that we ever did with the information that we had available."), and, thus, we accept respondent's concession and so find. Moreover, we believe that the record supports a finding that, under the Program generally, at the time petitioners conveyed the easement to the county and before, participants in the Program intended to make a gift to the county by way of a bargain sale of development rights. We have the testimony of two participants in the Program as to that point, petitioner Charles Browning and his neighbor, Gene Mullinix. In addition, Mr. Mullinix, who was a chairman of the board that supervised the Program and served on that board for 10 years, testified that the board that ran the Program never paid "full" fair market value for any easement that it purchased under the Program. Ms. Mennitto's testimony as to the procedures

followed to implement the Program, including publication of the Program, public hearings at which properties offered to the Program were presented for comment, the limitations on what the county would pay, and the appraisal process designed to insure that the county did not pay the full amount of the value of the development rights indicated by that appraisal, all convince us that participants in the Program generally intended to make a gift to the county by way of a bargain sale of development rights, and we so find.

Of course, our finding that participants in the Program intended a bargain sale is not determinative that there was a bargain sale. Nevertheless, it is determinative that the universe of sales to the county under the Program does not represent a universe populated with sellers all of whom (or, perhaps, even, any of whom) were looking for the best deal (highest price) possible. Sales data from that universe, thus, are not reflective of a market populated by buyers and sellers each trying to maximize profits by searching for the lowest (buyers) or highest (sellers) price possible. Any "market price" based on evidence from that market is not a market price fairly reflective of the price the easement would fetch in an uninhibited market. It is not a "fair" market price within the meaning of Heiner v. Crosby, 24 F.2d at 193, nor are the sales "market-place" sales within the meaning of section 1.170A-

14(h)(3)(i), Income Tax Regs., available to use as a "meaningful or valid" comparison to the sale of the easement.

E.  Before and After Valuation

1.  Introduction

The market for sales of development rights to the county under the Program was not an uninhibited market, but was a market characterized by sellers intending to make gifts to the county by way of bargain sales; therefore, petitioners are entitled to show the fair market value of the easement by evidence of the fair market value of the land before and after the conveyance of the easement.  Sec. 1.170A-14(h)(3)(i), Income Tax Regs. (third substantive sentence).  We shall now consider the expert testimony presented by both parties with respect to those values.

2.  After Value

The parties' expert appraisers, Messrs. Sapperstein (for petitioners) and Lipman (for respondent), agree that the highest and best use of the land after the conveyance of the easement to the county is as a farm.  Both experts value the land subject to the easement at $157,000.  Therefore, we find that the after value of the land subject to the easement on the conveyance date was $157,000.

3.  Before Value

Messrs. Sapperstein and Lipman also agree that the highest and best use of the land before the conveyance of the easement to

the county was for development into single family residential lots.  Both appraisers look to sales price data from sales of comparable properties sold for residential development purposes to determine the value of the land before conveyance of the easement.  Mr. Lipman is of the opinion that the comparison should be made on both a "per acre" and "per raw lot" basis.  He reports, however:  "Unfortunately, at least from the standpoint of this appraisal, we do not have an engineer's estimate of lot yield for the subject property.  Accordingly, we will depend primarily on value from a per acre perspective."  Mr. Lipman is of the opinion that the value of the land before conveyance of the easement was $10,000 an acre (for a total value of $524,400).

Mr. Sapperstein did not think that a dollars-an-acre basis was a proper basis for reaching a conclusion as to the value of the land because, in his opinion:

> Knowledgeable buyers of the subject property type, are typically interested in the development potential of the property, and are concerned with the property's yield.  By determining the number of lots that can be developed on the subject property, we remove from the appraisal problem any subjectivity related to the property's physical characteristics (i.e., shape, topography, wetlands, and other possible development constraints).  Thus, a comparison can be made on a "value per lot" basis with the comparable sales, requiring adjustment for location, site orientation, and accessibility.

Mr. Sapperstein is of the opinion that the value of the land before conveyance of the easement to the county was $45,000 a

lot.  Based on the Benning report, Mr. Sapperstein assumed that either 15 or 16 lots could be developed on the land and, accordingly, has the opinion that the value of the land before conveyance of the easement to the county is either $675,000 or $720,000.

Both Messrs. Lipman and Sapperstein are well qualified and provided us with helpful testimony.  They both used sales of comparable properties to value the land before the conveyance of the easement to the county.  Indeed, they relied on many of the same sales (of comparable properties) in reaching their respective conclusions.  They agree that a dollar-a-lot basis is an appropriate basis for comparison.  Because Mr. Lipman did not have an engineer's estimate of lot yield, he did not make a dollar-a-lot comparison, but, instead, relied on a dollar-an-acre comparison.  Messrs. Lipman and Sapperstein reach different conclusions, which are difficult to reconcile because of the different basis of comparison adopted by each.  We are not persuaded by Mr. Sapperstein that a dollar-a-lot basis is necessarily superior to a dollar-an-acre basis for making comparisons (we would have preferred to have each expert use both).  Mr. Lipman, however, at trial, agreed that "a knowledgeable buyer of the property would buy this property based on a lot yield as opposed to an acreage basis" and, in his

report, stated that a value of $43,700 a lot is "well supported by the market data".[5]

Since the parties' experts appear to be in relative agreement as to the value of the lots that the land would yield (Sapperstein: $45,000 a lot; Lipman: $43,700 a lot), we shall derive the before value of the land by multiplying a dollar-a-lot value by the land's lot yield.[6]  In addition, we shall accept

---

[5]    Although Mr. Lipman derived the $43,700 a lot value by dividing his appraisal value of the land (based on a $10,000 an acre appraisal of the land) by his estimate of the number of lots the land would yield, Mr. Lipman testified that the $43,700 a lot value would not change even if the land yielded more than 12 lots.

[6]    It appears that Mr. Lipman would multiply any dollar-a-lot value by the land's lot yield minus one lot because of the lot underlying the improvement.  Mr. Lipman testified as follows:

> If you divide 4 into 52.44 acres, you get 13 lots. I used 12 lots and Mr. Browning owns the house under which is another lot, which he has at the beginning of the day and he has at the end of the day.  So all he is giving away is 12 lots, and you then follow the math, 12 lots times $43,700, gives you a number, and if you take 52.44 acres times 3,000 an acre, which is the after value, which I think everybody agrees to, the difference, i.e., the value of the development rights, is $367,000, which is my number.

We believe, however, that petitioners' retention of certain rights with respect to the lot underlying the improvements does not warrant reducing lot yield for that lot in calculating the land's before value.  Adjusting the before value of the land in the manner advanced by Mr. Lipman would undermine the basic mechanics of the before and after valuation calculation, which is a method used to derive the value of the easement by measuring the difference between the before and after values of the land, both at the land's highest and best use.  Any adjustment for

(continued...)

Mr. Sapperstein's value of $45,000 a lot because it was derived from his analysis using a dollar-a-lot comparison and not from a calculation derivative of a dollar-an-acre comparison, i.e., Mr. Lipman's dollar-a-lot value.

We shall now address the principal point of contention between the parties, the lot yield of the land. Based on the Benning report, Mr. Sapperstein assumes that the land could be developed into either 15 or 16 residential lots. Mr. Benning is of the opinion that, if the land were developed in conjunction with either or both of the adjacent tracts of land (the Barnes tract and the Mullinix tract), certain land exchanges would be undertaken that would increase lot yield and other efficiencies would be obtained, which would allow 16 lots to be developed on the land. In the absence of such joint development, Mr. Benning is of the opinion that only 15 lots could be developed on the land. Mr. Lipman opined that 12 lots could be developed on the land, but stated that the effective lot yield of the land is 13 lots (including the lot underlying the improvement).

In determining both the highest and best use of a parcel of land and the fair market value of the parcel resulting from such use, the use of the parcel in conjunction with other parcels may

---

[6](...continued)
petitioners' retention of rights with respect to the lot underlying the improvements would properly be reflected in the after value of the land.

be taken into account.  See <u>United States v. Fuller</u>, 409 U.S. 488, 490 (1973) (citing <u>Olson v. United States</u>, 292 U.S. 246, 256 (1934)); <u>Dorsey v. Commissioner</u>, T.C. Memo. 1990-242 (with respect to the charitable contribution of a facade easement: "The fair market value of the easement should be based on the highest and best use for the property on its valuation date, including potential development.").  In <u>Olson v. United States</u>, <u>supra</u> at 257, the Supreme Court noted, however:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value--a thing to be condemned in business transactions as well as in judicial ascertainment of truth.  * * *

Had petitioners not conveyed the easement to the county, certainly there was the potential for their developing the land together with either or both of Messrs. Barnes and Mullinix. Mr. Mullinix testified regarding joint action with petitioners; and the parties have stipulated that, although Mr. Barnes did not testify, his testimony would have been consistent with the testimony of Mr. Mullinix.  Mr. Mullinix testified that there were benefits to either developing the properties jointly or jointly participating in the Program.  He testified that there was no written or enforceable agreement for joint action and that there was "some talk" about Mr. Barnes and Mr. Browning's

developing their tracts together and his not participating, although that would have put him "between a rock and a hard place". Mr. Mullinix testified that his preference was to participate in the Program and that, in fact, he, petitioners, and Mr. Barnes did do so in 1990. Petitioners have failed to convince us that, had they not participated in the Program, joint development was reasonably probable. Mr. Mullinix was a chairman of the board that supervised the Program and served on that board for 10 years. We think that he was strongly motivated to participate in the Program and would have borne some sacrifice to do so. From the stipulation that Mr. Barnes' testimony would have been consistent with that of Mr. Mullinix, we are unwilling to conclude that joint development between petitioners and Mr. Barnes was reasonably probable had petitioners decided to develop the land. We believe that, had petitioners decided against selling the easement to the county, the development of 16 lots on the land was not reasonably probable.

We have considered the testimony of all the experts and, although Mr. Lipman has raised some question in our mind as to the suitability of the land for 15 lots (on account of soil conditions and access), we have not been persuaded to disregard Mr. Benning's testimony, which we found competent and generally persuasive as to the 15 lot scenario. Accordingly, we find that the land was capable of being developed into 15 residential lots.

At $45,000 a lot, the value of the land before conveyance of the easement to the county would be $675,000 on a dollar-a-lot basis, which is Mr. Sapperstein's opinion on the basis of the 15 lot scenario.  Therefore, we find that the before value of the land on the conveyance date was $675,000.

### 4.  Conclusion

Both of the parties' expert appraisers, Messrs. Lipman and Sapperstein, rejected the purchase prices paid by Howard County under the Program as evidence of the fair market value of any of the development rights conveyed to the county, including the easement conveyed by petitioners.  We have considered the before and after valuation opinions of the parties' experts and conclude that the fair market value of the easement on the conveyance date was $518,000.

## V.  Analysis of the Amount Realized from the Sale of the Easement

Respondent argues that, in addition to the cash payments received and to be received by petitioners from Howard County, petitioners received other valuable consideration:  "The record of this case makes clear that petitioners conveyed the development rights easement to Howard County with the expectation of receiving valuable benefits, including cash and anticipated charitable contributions."  Respondent argues that the value of tax deferral received from the installment sale of the easement

to the county, the tax-free nature of the interest on the county's debt, and the value of the charitable contribution deduction all must be subtracted from the fair market value of the easement in determining the amount of any gift to the county.

Respondent is mistaken. As stated, supra sec. IV.A., the gift portion of a bargain sale is measured by the difference between the fair market value of the property and the amount realized from the sale. The tax consequences described are not part of the amount realized. See sec. 1001(b). Respondent's argument suggests that a taxpayer making a gift of stock worth $100 to a charitable organization may be entitled to a charitable contribution deduction of some lesser amount on account of the economic value of the deduction. That suggestion is untenable. The regulations provide explicitly that, if a charitable contribution is made in property, the amount of the contribution is the fair market value of the property. Sec. 1.170A-1(c)(1), Income Tax Regs.

Respondent's reliance on DeJong v. Commissioner, 36 T.C. 896 (1961), affd. 309 F.2d 373 (9th Cir. 1962), is misplaced. In DeJong, this Court found that a portion of the claimed charitable contribution was made in anticipation of the charitable organization providing "free" schooling to the taxpayers' children. The cost of that education reduced the amount of the charitable contribution. In this case, Howard County and

petitioners merely structured the easement conveyance in a manner that allowed petitioners to take advantage of certain tax benefits conferred by Congress.  None of the tax consequences enjoyed by petitioners constitutes consideration that is to be taken into account in determining the amount realized by petitioners on the sale of the easement.

Respondent has not argued that, if we fail to find that any of the tax consequences constitutes consideration, the consideration received by petitioners in consideration of the conveyance of the easement to the county was other than $309,000. Accordingly, we find that, in consideration of conveying the easement to the county, petitioners received $309,000.

VI.  Conclusion

On the conveyance date, petitioners made a charitable contribution to the county in the amount of $209,000 ($518,000-$309,000).

Decisions will be entered

for petitioners.