T.C. Memo. 2018-214

UNITED STATES TAX COURT

PINE MOUNTAIN PRESERVE, LLLP f.k.a. CHELSEA PRESERVE, LLLP,
EDDLEMAN PROPERTIES, LLC, TAX MATTERS PARTNER,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8956-13.                     Filed December 27, 2018.

David M. Wooldridge, Ronald Levitt, Gregory P. Rhodes, and Michelle A.

Levin, for petitioner.

Edwin B. Cleverdon and Horace Crump, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge: This case concerns charitable-contribution deductions

for three conservation easements. The easements were contributed in 2005, 2006,

**[*2]** and 2007, respectively. In our Court-reviewed Opinion (reviewed Opinion) issued today in this case the Court resolves all issues except the value of the 2007 easement. The reviewed Opinion holds that no deduction is allowed for the 2005 and the 2006 easements but that a deduction is allowed for the 2007 easement (to the extent of its value). We hold here that the value of the 2007 easement is $4,779,500.

## FINDINGS OF FACT

The findings of fact are set forth in the "Findings of Fact" section of the reviewed Opinion.

## OPINION

In Tax Court litigation, the usual rule is that the burden of proof is on the petitioner. This burden includes both the burdens of production and persuasion. Cozzi v. Commissioner, 88 T.C. 435, 443-444 (1987). The burden of production is satisfied if the petitioner comes forward with enough evidence to support a factual finding. Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987). The burden of persuasion is satisfied if the petitioner shows that, on the basis of the evidence, the fact is more probable than not. Merkel v. Commissioner, 109 T.C. 463, 476 (1997) (citing 2 McCormick on Evidence, sec. 339, at 439 (4th ed. 1992)), aff'd, 192 F.3d 844 (9th Cir. 1999). The petitioner is Eddleman

[*3] Properties, LLC (Eddleman Properties), the tax matters partner of Pine Mountain Preserve, LLLP. Although as the petitioner Eddleman Properties bears the burden of proof, the findings of fact would be the same even if respondent (the IRS) were to bear the burden of proof.

I.    Principal provisions of law

A deduction for charitable contributions is allowed by section 170(a)(1),[1] which provides:

> There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

A regulation implementing section 170(a)(1) provides in pertinent part: "If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution". Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Id. subpara. (2). The general principle

---

[1]All references to sections are to sections of the Internal Revenue Code of 1986, as amended and in effect for the tax years at issue, unless otherwise indicated.

[*4] that the amount of the charitable deduction is the fair market value of the donated property is no less true when the donation is of a partial interest in property, including a section 170(h)(2)(C) interest. Browning v. Commissioner, 109 T.C. 303, 314 (1997) (citing section 1.170A-7(c), Income Tax Regs.). Section 1.170A-7(c), Income Tax Regs., provides that (except as provided in section 1.170A-14, Income Tax Regs.) the amount of the deduction under section 170 in the case of a partial interest in property is the fair market value of the partial interest at the time of the contribution. Section 1.170A-14(h)(3)(i), Income Tax Regs., sets forth the rules for valuing a perpetual conservation restriction (i.e., a section 170(h)(2)(C) interest). This regulation provides in relevant part:

> [Sentence 1:] The value of the contribution under section 170 in the case of a charitable contribution of a perpetual conservation restriction is the fair market value of the perpetual conservation restriction at the time of the contribution. See § 1.170A-7(c). [Sentence 2:] If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. [Sentence 3:] If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. [Sentence 4:] The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property

[*5]     owned by a donor and the donor's family * * * is the difference
         between the fair market value of the entire contiguous parcel of
         property before and after the granting of the restriction.  [Sentence 5:]
         If the granting of a perpetual conservation restriction after January 14,
         1986, has the effect of increasing the value of any other property
         owned by the donor or a related person, the amount of the deduction
         for the conservation contribution shall be reduced by the amount of
         the increase in the value of the other property, whether or not such
         property is contiguous. * * *

Sec. 1.170A-14(h)(3)(i), Income Tax Regs.  We refer to this text as "the

regulation".  The following example is given to illustrate the fourth sentence of the

regulation:

>           Example (10).  E owns 10 one-acre lots that are currently
>     woods and parkland.  The fair market value of each of E's lots is
>     $15,000 and the basis of each lot is $3,000.  E grants to the county a
>     perpetual easement for conservation purposes to use and maintain
>     eight of the acres as a public park and to restrict any future
>     development on those eight acres.  As a result of the restrictions, the
>     value of the eight acres is reduced to $1,000 an acre.  However, by
>     perpetually restricting development on this portion of the land, E has
>     ensured that the two remaining acres will always be bordered by
>     parkland, thus increasing their fair market value to $22,500 each.  If
>     the eight acres represented all of E's land, the fair market value of the
>     easement would be $112,000, an amount equal to the fair market
>     value of the land before the granting of the easement (8 × $15,000 =
>     $120,000) minus the fair market value of the encumbered land after
>     the granting of the easement (8 × $1,000 = $8,000).  However,
>     because the easement only covered a portion of the taxpayer's
>     contiguous land, the amount of the deduction under section 170 is
>     reduced to $97,000 ($150,000 – $53,000), that is, the difference
>     between the fair market value of the entire tract of land before
>     ($150,000) and after ((8 × $1,000) + (2 × $22,500)) the granting of
>     the easement.

**[*6]** Id. subpara. (4), Example (10).

    II.    Eddleman Properties' litigating position as to the value

Eddleman Properties called Raymond Veal as an expert witness.[2] He opined as to the values of the 2005, 2006, and 2007 easements, using a similar approach to value each easement.

Because the issues regarding the valuation of the 2007 easement are similar to those regarding the 2005 easement, we discuss the valuation of the 2005 easement as an exemplar. Extrapolating the conclusions regarding the 2005 easement, we arrive at a value for the 2007 easement.

When Pine Mountain contributed the 2005 easement to the North American Land Trust (NALT), it owned 2,880.96 acres.[3] The easement covered 559.48 of the 2,880.96 acres. Veal valued the 2005 easement using the before-and-after formula in the third sentence of the regulation. He subtracted the value of the 2,880.96 acres after the easement from the value of the 2,880.96 acres before the easement.

---

[2]Both Veal and respondent's expert, Gary McGurrin, are experienced appraisers.

[3]The real property Pine Mountain owned at any given date is referred to as the Pine Mountain property.

**[*7]**    In determining the value of the 2,880.96 acres before the 2005 easement, Veal divided the 2,880.96 acres into four groups:  (1) 559.48 acres of conservation-easement property, (2) 1,601.23 acres of land, contiguous to the easement area, which he determined to be developable land, (3) 693.7 acres of land, contiguous to the easement area, which he determined to be undevelopable because of steep terrain or other geographic problems, and (4) 26.55 acres of land, contiguous to the easement area, which he determined to be best suited for use as commercial land.  To determine the value of the 559.48 acres of conservation-easement property, he employed two methods:  (1) the sales-comparison method and (2) the discounted-cash-flow method.  Veal's discounted cash-flow analysis assumed that, had the 559.48 acres not been restricted by the easement, the land could have been developed into a residential subdivision with 865 units.  Using various assumptions about the sale price of the units, the cost of development, and the discount rate, he determined that the landowner could have earned cash flows of $55,900,000 from the 559.48 acres.  The sales-comparison method, he testified, "develops an indication of value by researching, verifying, and analyzing sales of similar properties."  The properties that Veal compared to the conservation easement property were likely to be developed.  On the basis of sales of these properties, he concluded that the value of the conservation-easement property

**[\*8]** under the sales-comparison method was $55,950,000. He ultimately opined that the value of the conservation-easement property was $55,950,000, the value that corresponds to the sales-comparison-method value. To value the other three groups of properties, he used the sales-comparison method but not the discounted-cash-flow method. Veal's conclusion as to the pre-easement value of the 2,880.96 acres comprising the four groups was:

| Group | Value per acre | Total value |
|---|---|---|
| (1) 559.48 acres of conservation easement property | $100,000 | $55,950,000 |
| (2) 1,601.23 acres--developable | 20,000 | 32,000,000 |
| (3) 693.7 acres--undevelopable | 1,000 | 690,000 |
| (4) 26.55 acres--commercial | 190,000 | 5,040,000 |

To determine the value of the 2,880.96 total acres <u>after</u> the 2005 easement, Veal first addressed the value of the 559.48 acres burdened by the easement. He divided these 559.48 acres into two areas: (1) the land inside the 10 building areas and (2) the land outside the 10 building areas.

In valuing the land inside the 10 building areas, Veal used two inconsistent calculations. In the first, he stated that each building area (each of which he described in his first calculation as a "1 acres Building Pad") was worth $70,000. Veal determined that the $70,000 value of each building area was equal to (1) the price that he estimated would be received from the sale of the building area minus

[*9] (2) allowances for (a) development costs, (b) marketing costs, and (c)

entrepreneurial profit.  He calculated that the total value of the 10 building areas

was $700,000, equal to $70,000 per acre × 10 acres.  The first calculation correctly

assumed that the total area of the 10 building areas was 10 acres.  With the second

calculation, however, Veal assumed that the total number of acres of the 10

building areas was 2 acres.  He further assumed that the value of the 10 building

areas was $700,000, equal to $350,000 per acre × 2 acres.  The difference between

the two calculations is illustrated in the table below:

| Value of 10 building areas after easement:  Veal's calculations | | | |
|---|---|---|---|
| | Value per acre | Number of acres | Total value = value per acre × number of acres |
| First calculation | $70,000 | 10 | $700,000 |
| Second calculation | 350,000 | 2 | 700,000 |

The two calculations arrived at the same value, $700,000, but involved

inconsistent numbers of acres and values per acre.  Veal intended to calculate the

$700,000 value using the formula $70,000 × 10 acres, not the formula $350,000 ×

2 acres.  His intended calculation comports with the actual acreage, 10.  The

reviewed Opinion issued today observes that Veal used two inconsistent

calculations in valuing the land inside the 10 building areas.  The reviewed

Opinion does not state what effect this inconsistency should have on the Court's

findings of fact.  The inconsistency is a relatively minor unintended error.  The

[*10] IRS does not argue that it should detract from the weight we place on Veal's opinion. The inconsistency does not affect the weight we accord Veal's opinion of value.

Veal also gave his opinion on the value of the land encumbered by the easement other than the 10 building areas. He valued this portion of the land at $1,000 per acre. He used the sales-comparison method, which involves finding sales of comparable land encumbered by conservation easements. In his calculations, Veal incorrectly assumed that this portion of the land was 557.48 acres--equal to 559.48 acres minus 2 acres. The land under the easement was 559.48 acres. The building areas were 10 acres. Therefore the correct area of the portion of the land Veal valued was 549.48 acres, equal to 559.48 acres minus 10 acres. Veal opined that the value of this portion of the land was 557.48 acres × $1,000 = $560,000. Had Veal calculated the acreage correctly, it appears that this value would have been $549,480, which, rounded to the nearest ten thousand, as was Veal's custom, is $550,000. The effect of the 8-acre miscalculation is illustrated by the table below:

| [*11] | After-easement value of the land burdened by easement except for the 10 building areas | | |
|---|---|---|---|
| | Value per acre | Number of acres | Total value = value per acre × number of acres |
| Veal's calculation | $1,000 | 557.48 | $560,000 |
| Veal's calculation if the number of acres is corrected | 1,000 | 549.48 | 550,000 |

Veal's miscalculation of the acreage resulted in an overestimate of the value of the acreage. Because Veal estimated that the value of the easement was the difference between the value of the Pine Mountain property before and after the easement (using the before-and-after method), this means his overestimate of the value of the particular portion of the land after the easement resulted in an underestimate of the value of the 2005 easement. Thus, his error was in the IRS's favor. If the error were corrected, the value of the 2005 easement would be $10,000 more than the value urged by Eddleman Properties. Under these circumstances, we do not correct Veal's $10,000 error. Eddleman Properties failed to bring this error to the Court's attention, and the IRS has not given its views as to the effect of this error.

We will now describe how Veal determined the after-easement values of the three components of the 2,880.96 acres other than the 559.48 acres subject to the easement.

**[*12]** Veal opined that the easement on the 559.48 acres had no effect on the values of the other three components of the 2,880.96 acres. Therefore, in his view, the values of the other three components were the same before and after the easement. Here is Veal's explanation as to why the easement had no effect on the other three components of the land:

> The value of the other land components are [sic] not positively affected by the easement since developing the easement land would enhance the value of the other components by creating a development of high value homes and other amenities. There is not sufficient data available to determine the extent to which the other parcels are negatively affected by filing the easement. Therefore I conclude that the other parcels are not affected by filing the easement document.

> Veal's conclusion as to the value of the 2005 easement can be summarized as follows:

**[*13]** Numerical summary of Veal's valuation of the 2005 easement

| Description of land | Acres | Value before easement | Value after easement |
|---|---|---|---|
| Land subject to easement--excluding building areas (actual acreage 547.48) | 557.48 | (¹) | $560,000 |
| Land subject to easement--building areas only (actual acreage 10 acres) | 2.00 | (¹) | 700,000 |
| Total land subject to easement | 559.48 | $55,950,000 | 1,260,000 |
| Developable land outside easement | 1,601.23 | 32,000,000 | 32,000,000 |
| Undevelopable land outside easement | 693.70 | 690,000 | 690,000 |
| Commercial land outside easement | 26.55 | 5,040,000 | 5,040,000 |
| Total Pine Mountain property when 2005 easement was donated, including land subject to easement and land outside easement | 2,880.96 | 93,680,000 | 38,990,000 |

¹Not separately valued.

The value of the 2005 easement, according to Veal, is the $93,680,000 pre-easement value of the land minus the $38,990,000 post-easement value of the land, or $54,690,000.

Veal's approach to valuing the 2007 easement was similar to his approach to valuing the 2005 easement. He concluded that the 2007 easement was worth $9,110,000. Eddleman Properties has adopted Veal's valuation of the 2007

**[*14]** easement as its litigating position in this case. The value is greater than the

value originally reported by Pine Mountain on its partnership return.[4]

III.    The IRS's litigating position as to the value

The IRS called McGurrin as an expert witness to value the 2005, 2006, and

2007 easements. McGurrin used the same approach to value each of the

easements. We describe his approach in detail with respect to the 2005 easement.

To value the 2005 easement, McGurrin considered two valuation methods:

the sales-comparison method and the before-and-after method. In applying the

sales-comparison method, he considered the sale prices of easements on rural land

with little development potential. Relying on the sale prices of these other

easements, McGurrin concluded that the value of the 2005 easement was $2,000

per acre. Because the area of the easement was 559.48 acres, this meant that the

---

[4]The value reported by Pine Mountain on its partnership return was $4,100,000 for the 2007 easement. Attached to the return was an appraisal by Claude Clark III that stated that the value of the easement was the same as the value reported for that easement. The IRS has stipulated that the Clark appraisal was a "qualified appraisal" as that term is defined by sec. 170(f)(11)(E)(i). This stipulation means that Pine Mountain has met the requirement, found in sec. 170(f)(11)(A)(i) and (D), that a taxpayer must attach a qualified appraisal to the return when claiming a charitable-contribution deduction of more than $500,000. Neither Eddleman Properties nor the IRS argues that the Court should rely on the Clark appraisal to value the 2007 easement. Clark was not called as an expert witness (or a fact witness, for that matter). Consequently, we do not consider the Clark appraisal in our view of the value of the easement.

[*15] value of the easement was $1,119,000. McGurrin considered the sales of other easements to be a better indication of the value of the 2005 easement than the before-and-after method.

Second, McGurrin considered the before-and-after method. In determining the pre-easement value of the approximately 2,900 acres owned by Pine Mountain at the time it granted the 2005 easement, he made the assumption that the highest and best use of that land was undeveloped, open space. Relying on the sale prices of undeveloped land he thought similar to the Pine Mountain property, he opined that the unencumbered value of the 2,900 acres was $5,200 per acre, or $15,080,000. McGurrin determined the after-easement value of the approximately 560 acres to be $2,000 per acre, or $1,120,000. He used sales of comparable land encumbered by conservation easements to arrive at this value. For the remaining 2,340 acres (i.e., 2,900 acres – 560 acres), McGurrin opined that the value remained unchanged at $5,200 per acre, or $12,168,000. Under the before-and-after method, as used by McGurrin, the value of the 2005 easement was $2,912,000. According to McGurrin's calculations, this is equal to the "before" value of the 2,900 acres ($15,080,000) minus the "after" value of the 2,340

[*16] noneased acres, $12,168,000.[5] But because McGurrin considered the comparable-sales method to be the best indication of the value of the easement, he ultimately opined that the value of the 2005 easement was $1,119,000, the value of the easement under the comparable-sales method.

McGurrin's approach to valuing the 2007 easement was the same as his approach to valuing the 2005 easement. In applying the comparable-sales method, McGurrin estimated that the 2007 easement was worth $2,000 per acre. He concluded that the 2007 easement was worth $449,000.

IV.  Analysis

Each party challenges the reliability of the method used by the other party's expert and asserts that the method does not comport with the regulation (i.e., the regulation that governs the valuation of a perpetual conservation restriction, section 1.170A-14(h)(3)(i), Income Tax Regs.). Both parties' challenges are correct. Neither side's expert witness employed a method that fits within the parameters of the regulation.

Let us begin with the second sentence of the regulation. See supra p. 4. This sentence states that if there is a substantial record of sales of easements

---

[5]It seems that the value of the 2005 easement should have been calculated as $1,792,000, equal to (2,900 acres × $5,200) − (560 acres × $2,000) − (2,340 acres × $5,200).

[*17] comparable to the donated easement, then the value of the easement should be based on the sale prices of the comparable easements. McGurrin identified sales of easements that he thought comparable to the easements donated by Pine Mountain. He used these sale prices to value the Pine Mountain easements. Thus, the method he used is the comparable sales method discussed in the first sentence of the regulation. However, Eddleman Properties contends that the easements McGurrin used were not comparable to the Pine Mountain easements because the land underlying the McGurrin easements had little development potential. Eddleman Properties contends that it was reasonably probable that the land subject to the Pine Mountain easements would have been developed.

The resolution of the question of whether it was reasonably probable that the land would be developed bears on another controversy between the parties involving the before-and-after method. As noted above, Veal determined the "before" values of the land under the assumption that the land could be developed. This resulted in correspondingly high "before" values. In valuing property, it is standard practice to value the property at its most valuable reasonably probable use. See Frazee v. Commissioner, 98 T.C. 554, 563 (1992). This use is known as the "highest and best" use. See id. Thus, Veal's "before" values for the Pine Mountain property are proper only if it was reasonably probable that the Pine

**[*18]** Mountain property would be developed when Pine Mountain contributed the easements to NALT.

The IRS contends that it would have been unreasonable to assume, when the easements were granted, that the Pine Mountain property would be developed. The IRS observes that when the 2005 easement was granted, county zoning regulations prohibited the development of the Pine Mountain property. Furthermore, the IRS contends, development of the Pine Mountain property could have occurred only with the property in the hands of Douglas Eddleman because of his experience developing real estate. In valuing the 2007 easement under the before-and-after method, the land should be assumed to be in the hands of hypothetical persons, not Pine Mountain (whose general partner was Eddleman Properties, an entity owned by the Eddlemans). Sec. 1.170A-1(c)(2), Income Tax Regs.; Chapman Glen Ltd. v. Commissioner, 140 T.C. 294, 325 (2013). Although the Pine Mountain property was not zoned for development by the town of Westover until April 2007, Douglas Eddleman and the mayor of Westover convincingly testified that they reasonably assumed early in the process of negotiating the annexation of the Pine Mountain property that the property would eventually be zoned for development. Despite Douglas Eddleman's significant personal role in getting the land zoned for residential development, a third party

[*19] could also have accomplished this. The Pine Mountain property was between the city of Chelsea and the town of Westover. These two municipalities had an incentive to compete with each other for development. Even without Douglas Eddleman's personal influence, one of these municipalities would have been convinced to annex the Pine Mountain property and allow it to be developed. Thus, it was reasonably probable that the Pine Mountain property would eventually be zoned for development. See Frazee v. Commissioner, 98 T.C. at 563-566 (when land was donated in October 1985, it was zoned for agricultural use; however, it was reasonable and probable that it would later be rezoned for industrial or commercial use; therefore it was permissible to assume that its highest and best use was industrial or commercial). Although Douglas Eddleman also played a crucial role in assembling the property that made up the Pine Mountain property, and although he accomplished the purchase of three parcels, parcels 1, 3, and 4, that provided access to the highways from the rest of the property, and although without these parcels the Pine Mountain property could not be made into a residential development, by the time Pine Mountain had granted the 2005 easement, it had already purchased the three parcels. Access to the highways had been achieved by this purchase. Thus, as we find, it was reasonably probable that the Pine Mountain property would be developed. The reviewed

**[\*20]** Opinion issued today notes that Veal testified erroneously that Westover annexed the Pine Mountain property shortly after the 2005 easement was granted; the annexation did not occur until March 2007. The reviewed Opinion does not state what effect this error should have on the Court's findings of fact. Despite this error, the preponderance of evidence demonstrates that it was reasonably probable that the Pine Mountain property would be developed. This conclusion is not affected by the fact that real-estate prices peaked in the year 2006 and that, on account of the subsequent fall in real-estate prices, the Pine Mountain property was never actually developed. The question of whether there was a reasonable probability the property would be developed is resolved according to the circumstances existing as of the dates of valuation, which are the dates the easements were donated. See Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (property is valued according to the facts and circumstances existing on the valuation date). Pine Mountain kept buying land during each of the three years in which the easements were donated. The last of the 10 parcels of the Pine Mountain property was bought in the year 2007. The continual buying of property showed that the Eddlemans still thought that the Pine Mountain property would be developed. Two sales of partnership interests suggested that outside investors also thought that the Pine Mountain property would be developed. The basic facts

**[\*21]** affecting the prospects of developing the Pine Mountain property--the access from the property to highways, the likelihood that one of the municipalities would approve a real-estate subdivision, and the changing state of the real-estate market--are facts that would be known to third parties or could easily be learned by third parties. These considerations lead us to believe that when the 2007 easement was granted, the Pine Mountain property could be sold to a third-party buyer and the buyer would have paid a relatively high price that corresponded to the development potential of the property. Because the Pine Mountain property had development potential, the easements examined by McGurrin were not comparable to the Pine Mountain easements. Therefore, the second sentence of the regulation does not compel the use of the comparable sales method as employed by McGurrin.

This bring us to the third sentence of the regulation. See supra p. 4. The third sentence states that if no substantial record of market-place sales is available, then as a general rule, the value of the easement should be determined using the before-and-after method. See Hilborn v. Commissioner, 85 T.C. 677, 688-690 (1985). Because, as explained above, the sale prices of easements used by McGurrin were not of easements comparable to the Pine Mountain easements, it might seem that the third sentence requires the use of the before-and-after method.

[*22] Veal used the before-and-after method. Therefore, Veal's method might seem to comport with the third sentence of the regulation. This would ignore, however, the regulation's use of the term "general rule". Only as a "general rule", the regulation says, should the before-and-after method be used. In this case, a departure from the general rule is justified. The before-and-after method as employed by Veal gives an overestimate of the value of the 2007 easement. McGurrin's survey of the sale prices of other easements, while not itself capable of resolving the value of the Pine Mountain easements (because the easements restrict rural land with limited development potential), provides a check on Veal's estimates of value. McGurrin demonstrated that the buyers of conservation easements (primarily conservation organizations and governmental entities) bought conservation easements in rural areas for approximately $2,000 per acre. Veal, by contrast, opined that the value of the 2005 easement was nearly $98,000 per acre. This is about 50 times the rural price. It is somewhat difficult to understand why buyers of conservation easements (primarily conservation organizations and governmental entities) would pay 50 times the rural price for an easement on developable land. A partial explanation is that an easement on developable land is more valuable than one on undevelopable land. Protecting land that could otherwise be part of a residential development might be thought to

[*23] make a greater contribution to the environment than protecting rural land.
Additionally, such an easement might have greater scenic value. Thus, the Pine
Mountain easements' location in a potential residential development likely
justifies a conservation organization's or a governmental entity's paying a
premium for the easement. However, a fifty-fold premium is more than would be
paid by a buyer with constrained resources, such as a conservation organization,
that seeks to maximize the effectiveness of its dollars. We are thus left with the
impression that Veal overestimated the value of the 2007 easement and posit two
reasons Veal's method led to an overestimate. First, Veal's "after" value (the
value of the Pine Mountain property after the granting of the easement) did not
take into account the beneficial effect that the easement had on the surrounding
land. This point is discussed in further detail in the next paragraph. Second, the
high development potential of the Pine Mountain property may make the easement
on the property difficult to value using the before-and-after method. One can
think of the before-and-after method for valuing an easement as analogous to the
cost method of valuing a building. The cost method is founded on the assumption
that no one will buy a completed building for a price greater than it would cost to

**[\*24]** the construct the building.[6] Thus, the cost of a building can be an indicator of its market price. However, in some instances, the cost of the building does not directly translate to market value. For example, suppose that someone constructs a luxury house (with high-quality materials and fixtures, etc.) at a cost of $1 million in a modest neighborhood where the other houses sell for $30,000. A buyer might pay more money for the luxury house, but is unlikely to pay the full $1 million that the house cost to build.[7] When valuing an easement, the "cost" of an easement can be thought of as the amount by which the easement diminishes the value of the underlying land. Under certain circumstances this difference in value can be used to indirectly value the easement, just as the cost of a building may be used to indirectly value a building. However, the diminution in value may not always be a good indicator of the value of the easement, just as the cost of a building may not always be a good indicator of its value. Here, no buyer would be willing to pay the full "cost" of the Pine Mountain 2007 easement as measured by the before-and-after method. Because Veal's before-and-after method overestimates the value of the easement on the Pine Mountain property for the reasons identified, the

---

[6]As Veal testified: "The cost approach assumes that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility."

[7]For simplicity, this example ignores land values.

**[\*25]** "general rule" of the third sentence of the regulation does not require the acceptance of Veal's before-and-after method.

Now consider the fourth sentence of the regulation. See supra pp. 4-5. This sentence gives the rule that if the restriction in question covers only "a portion of the contiguous property owned by the donor", then the value of the restriction is "the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction." Each of the easements donated by Pine Mountain covers only a portion of the contiguous property owned by Pine Mountain at the grant of each easement. Therefore, Eddleman Properties argues, the fourth sentence of the regulation requires the use of the before-and-after method. The fourth sentence is designed to force the appraiser to account for the beneficial effects of the easement on the contiguous property that is not restricted by the easement. See sec. 1.170A-14(h)(4), Example (10), Income Tax Regs. ("[B]y perpetually restricting development on this portion of the land, E has ensured that the two remaining acres will always be bordered by parkland, thus increasing their fair market value to $22,500 each."). Veal assumed that the easements contributed by Pine Mountain to NALT did not affect the value of the portions of the Pine Mountain property unrestricted by the particular easement. However, the easement had positive external effects on the unrestricted property

[*26] that was contiguous with the restricted property. The three easements run along mountain ridges and protect those ridgelines from construction. The easements enhance the value of the other Pine Mountain property by preserving scenic views of the ridgelines. The protections afforded by the easements provide other benefits as well. The ridgelines protected by the easements could be used for recreational purposes, such as hiking. One of Eddleman Properties' witnesses, an expert in real-estate development, confirmed in her testimony that the protected ridgelines would afford recreational benefits.

Veal's opinion about the value of the 2007 easement thus does not account for beneficial effects of the easement on the unencumbered portions of the Pine Mountain property.[8] This failure is inconsistent with the fourth sentence of the

---

[8]Veal concluded that the easements actually diminished the value of the unencumbered land because the easements prevented Pine Mountain from developing the mountaintop properties, development which he assumed would have had a favorable effect on the lower-altitude home lots on unencumbered land. Veal's opinion did not account for this effect because he thought the effect was too difficult to quantify. Veal's failure to quantify the amount by which he thought the easements diminished the value of the other land may mean that it is unnecessary to consider whether Veal is correct that the easements diminished the value of the other land. The assumption, not being quantified by Veal, possibly did not affect Veal's valuation. To the extent it matters, we are not convinced that the development of mountaintop properties would have had a favorable effect on the lower-altitude home lots. Douglas Eddleman wrote in a memorandum to Veal that, on the basis of his experience with developing mountain real estate, he believed the sale of high-priced houses at the top of a mountain serves to increase

(continued...)

**[\*27]** regulation.[9]  Therefore, the fourth sentence of the regulation does not require us to accept Veal's opinion about the value of the 2007 easement.

The IRS argues that Veal's method contradicts the fifth sentence of the regulation.  See supra p. 5.  The fifth sentence of the regulation states that if the restriction has the effect of increasing the value of unrestricted property owned by the donor, whether contiguous or noncontiguous, the amount of the deduction must be reduced by the increase in value.  Because Veal's method does not

---

[8](...continued)
the value of the houses at the bottom.  The memorandum was the source of Veal's assumption.  Veal uncritically accepted Douglas Eddleman's opinion, for which Douglas Eddleman provided no specific data or examples.  As an expert in valuation, Veal could have formed his own opinion on the validity of this theory.  He also could have supplied corroboration for the theory.  In the end, the theory was not corroborated by the evidence in this case.  We are not persuaded it is correct.

[9]Eddleman Properties notes that the IRS's expert witness, McGurrin, did not opine that the easement would enhance the value of the surrounding land.  Therefore, Eddleman Properties implies, the IRS has no cause for contending that the easement would enhance the value of the surrounding land.  However, McGurrin held a different view of the development potential of the Pine Mountain property.  He thought it would not be developed and would remain rural.  Under such an assumption, the easement would have a relatively insignificant effect on contiguous land.  An owner of timberland values the scenic views from the timberland less than the owner of a residential lot values the scenic views from a residential lot.  Thus, McGurrin's failure to opine that the easements enhanced the value of the surrounding land is insignificant.  His failure does not sway our view that the easements enhanced the value of the surrounding land and that Veal overestimated the value of the 2007 easement by ignoring the enhancements.

**[\*28]** comport with the fourth sentence of the regulation, it is unnecessary to consider whether his method is also out of conformity with the fifth sentence.[10]

In summary both Eddleman Properties and the IRS favor valuation opinions that are based on methods that do not meet the requirements of the regulation. Now consider the legal significance of this. In a case of unilateral noncompliance, where one party's proferred method complies with the regulation but the other's does not, it might be appropriate, or even mandatory, for a court to adopt the opinion of the expert whose method complies with the regulation. In this case, however, neither expert's methods complies. Nothing in the regulation counsels one expert's method over the other in this case of bilateral noncompliance. Section 170(a)(1) provides that a charitable-contribution deduction is allowable only "if verified under regulations prescribed by the Secretary." The regulation governing the valuation of perpetual conservation restrictions, section 1.170A-14(h)(3)(i), Income Tax Regs., governs both the taxpayers (seeking deductions) and the IRS (disallowing deductions) alike. The regulation is therefore not a "verification" regulation within the meaning of section 170(a)(1).

---

[10]C. Timothy Lindstrom, in "A Guide to the Tax Aspects of Conservation Easement Contributions", 7 Wyo. L. Rev. 441, 504 (2007), argues that the fifth sentence does not apply when the unrestricted property is contiguous with the restricted property, as it is here.

**[\*29]** Because the regulation does not require us to accept one expert's conclusion over the other's, this case is like any other case in which experts offer competing estimates of fair market value. The Court decides what weight to give those estimates by, among other things, examining the factors they considered in reaching their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). The Court is not bound by the opinion of any expert witness, and it may accept or reject expert testimony in the exercise of its sound judgment. Estate of Newhouse v. Commissioner, 94 T.C. at 217; Chiu v. Commissioner, 84 T.C. 722, 734 (1985) (the Court is not required to adopt the opinion of an expert that is contrary to its own judgment). The Court may selectively use a portion of the opinion of an expert. Parker v. Commissioner, 86 T.C. 547, 562 (1986). The Court may also reach a decision as to the value of property that is based on its own examination of the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

To determine the value of the 2007 easement, we adopt the following approach: The value of the easement should be estimated by giving equal weight to the values assigned by Veal and McGurrin. To explain why this approach is reasonable under the circumstances, we will discuss three general topics: (1) how both experts' opinions have aspects that are useful to the determination of the

[*30] easement's value, (2) the nature of the errors made by each expert, and (3) how weighting the two experts' opinions tends to correct the errors in their respective approaches.

1. <u>Aspects of both experts' opinions that are useful to the Court in valuing the 2007 easement</u>. Both experts' opinions have aspects that are helpful to the Court in determining the value of the 2007 easement. Veal correctly assumed that the Pine Mountain property would be developed. McGurrin properly determined the value of the easement by reference to the prices paid for other conservation easements. The prices paid for other conservation easements are helpful in valuing the 2007 easement although they cannot exclusively determine the value because the prices McGurrin used correspond to prices of easements in rural areas.

2. <u>The nature of the errors made by each expert</u>. Despite useful aspects, each expert's opinion rested on errors. Veal overestimated the value of the 2007 easement by ignoring the beneficial effects the easement had on the unrestricted Pine Mountain property. Veal also overestimated the value of the easement because the diminution of the underlying land's value is an imperfect proxy for the market value of this particular easement that restricts the use of highly valuable

[*31] developable land.[11] McGurrin assumed incorrectly that the Pine Mountain property would not be developed. This assumption resulted in McGurrin's underestimating the value of the 2007 easement because he valued the easement on the basis of actual sale prices of easements on rural undevelopable land.

3. Why weighting the two experts' opinions equally tends to correct the errors in their respective approaches. We will now explain why Veal's errors have an effect on value opposite to McGurrin's, how the effects are of roughly the same magnitude, and how equally weighting the value assigned by each expert has the effect of correcting their errors. Both of Veal's errors resulted in an overestimate of the value of the 2007 easement. Ignoring the beneficial effects of the easement resulted in an underestimate of the "after" value of the Pine Mountain property after the donation of the easement. Because the value of an easement under the

---

[11]The IRS also attacks Veal's valuations of the Pine Mountain property before the easements because he did not consider the relatively low actual prices Pine Mountain paid for the property. We are not persuaded that Veal's method was flawed for this reason. Veal opined that the value of the Pine Mountain property was much higher than its purchase price because he thought that when the easements were granted, it was reasonably probable that the land could be developed. We agree with this assumption. The purchase price of the Pine Mountain property did not reflect the value of the land as a commercial and residential subdivision. This is because the land was assembled parcel by parcel. The low price for each parcel did not reflect, for example, that the fully assembled property would have access to the highway system. This access was necessary for the fully assembled property to be developed into a subdivision.

[*32] before-and-after method is the value of the property before the easement minus the value of the property after the easement, an underestimate of the "after" value results in an overestimate of the value. Similarly, Veal's use of the before-and-after method in the context of an easement on highly valuable developable property resulted in an overestimate of the value of the easement because the high "cost" of creating the easement (i.e., the reduction in value of the underlying land caused by restricting the land) does not necessarily translate into market value. Conversely, the error made by McGurrin resulted in an underestimate of the easement's value. McGurrin assumed that the Pine Mountain property would not be developed. Therefore, he compared the 2007 easement to easements on rural land that would not be developed. Had he compared the 2007 easement to easements on developable land, he presumably would have given a higher value to the easement. Thus, the errors in Veal's approach have the opposite effect on value from the error in McGurrin's approach. Veal overestimated the 2007 easement's value. McGurrin underestimated it. Although the errors in the experts' approaches have opposite effects on value, the effects are similar in proportion because the magnitude of all three errors is proportional to the probability that the Pine Mountain property would be developed. To understand this proposition, suppose that the Pine Mountain property was undevelopable, i.e.,

[*33] that there was a low probability that it would be developed. In this undevelopable property scenario, Veal's method of valuing the 2007 easement would return a fairly low value for the easement. Veal used the before-and-after method, under which the value of an easement is considered to be equal to the pre-easement value of the land minus the post-easement value of the land. Thus, Veal's method would have placed a low "before" value on undevelopable land and a correspondingly low value on the easement on such land. The first error we ascribe to the Veal opinion--that he failed to account for the value-enhancing effect of the 2007 easement on the surrounding Pine Mountain property--would have a minimal effect if the Pine Mountain property were undevelopable. That is because a conservation easement confers low benefits on the surrounding land when that surrounding land is not developable. A conservation easement does not significantly enhance the value of surrounding land that is used for timber or hunting, especially compared to the value enhancement conferred on a residential subdivision. The second error we ascribe to Veal--that his before-and-after method exaggerates the value of an easement when the underlying land is exceedingly valuable and when there is a competing supply of cheaper rural easements--also would have minimal effect in the situation in which the underlying land is undevelopable. Thus, Veal's method of valuing the Pine

**[*34]** Mountain property would be a fairly reliable way of estimating the value of the 2007 easement in a hypothetical situation in which the Pine Mountain property is undevelopable. A similar conclusion can also be easily made with respect to McGurrin's method in that situation. If the Pine Mountain property is undevelopable, then McGurrin's method, which relies on the sale prices of rural undevelopable property, would be a fairly reliable method of valuing the Pine Mountain property. Now consider what happens if the probability of developing the Pine Mountain property is higher. With a higher probability, the value of the land is higher. Veal's method would then produce a higher value for the 2007 easement because, under the before-and-after method, an easement on high-value land is worth more than an easement on low-value land. Part of the easement's value that would result using Veal's method would be an exaggeration due to the two errors we ascribe to Veal: (1) his failure to account for the enhancement effect would mean that his "after" value is too low, which makes his easement value too high, and (2) his failure to account for the downward price pressure placed on the market for conservation easements by the availability of cheaper rural easements also means that his easement value is too high. To more fully demonstrate that the effects of both errors that we ascribe to Veal are proportional to the probability the land will be developed, we will start with Veal's first error--

[*35] his failure to properly account for the enhancement effect of the 2007 easement on the noneasement property. The greater the probability that the Pine Mountain property will be developed, the greater the effect of the error. Beautiful mountain views enhance the value of residential property--i.e., property on which homes will sit. Such views are less important to the value of undeveloped property--i.e., hunting lands and timberlands. Now consider Veal's second error: He used the before-and-after method exclusively to value the 2007 easement even though cheaper easements on rural land would (partially) compete with the Pine Mountain easement. The greater the probability the Pine Mountain property will be developed, the greater the reduction in the value of the Pine Mountain property that will result from the imposition of the easement. And the greater the reduction in value, the greater discrepancy there will be between the estimated value of the Pine Mountain easement using the before-and-after approach and the value of rural easements. Now consider how the value under McGurrin's method would change as the probability of developing the land is hypothetically increased. McGurrin exclusively used the value of rural easements to value the 2007 easement. The greater the probability of development of the Pine Mountain property, the more valuable the easement on portions of the Pine Mountain property are compared to rural easements. Thus, the greater the probability of

**[*36]** development, the greater McGurrin's underestimate of the value. In conclusion, the magnitude of Veal's overestimate of the Pine Mountain 2007 easement's value correlates with the probability of developing the Pine Mountain property; and the magnitude of McGurrin's underestimate of the Pine Mountain 2007 easement's value also correlates with this probability. That means that as the probability of developing the Pine Mountain property increases, each expert's error increases in proportion to the other expert's error. The mere fact that the magnitude of the two experts' errors vary proportionally does not mean that the magnitudes are equal. However, on our review of the entire record, we are convinced that the errors are roughly equal in magnitude.

On the basis of the record, we believe that the amount by which Veal overestimated the value of the 2007 easement is comparable in magnitude to the amount by which McGurrin underestimated it. Thus, combining Veal's approach and McGurrin's approach tends to correct their respective errors. It is appropriate to combine their respective estimates of value for the easement by giving each estimate equal weight.

Using an equally weighted average, we conclude that the value of the 2007 easement is $4,779,500, equal to 50% of Veal's $9,110,000 value plus 50% of McGurrin's $449,000 value.